IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | CR. N0. 08-91 |
| | ) | |
| CHARLES THOMAS SOLOMON, | ) | |
| | ) | |
| Defendant | ) | |

## OPINION

Pending before the Court are the Defendant's Motion to Suppress Evidence [Doc. #33] and Defendant's Amended Motion to Suppress Evidence [Doc. #42]. In his suppression motion and amended suppression motion, the defendant requests that the evidence seized from his person by police on May 1, 2007 and the defendant's subsequent statement to police made on May 1, 2007 be suppressed. Motion, ¶ 7; Amended Motion, ¶ 7. The bases for the motion to suppress set forth in the motions are that: (1) the police did not have probable cause to detain the defendant because "[n]either the transfer nor possession of something unidentifiable gives rise to probable cause;" (2) the defendant was questioned without being warned of his rights and the incriminating statement he made was the fruit of an illegal arrest; and (3) any statement made by the defendant was involuntary under the totality of the circumstances. Motion, ¶¶ 5 and 6; Amended Motion, ¶¶ 5 and 6. Additionally, at the suppression hearing held on these motions on July 31, 2008, the defense argued that under the facts of the case, the police officers' conduct in getting Solomon to open his hand and show them drugs constituted an illegal search.

In response, the Government contends that the motion to suppress should be denied because: "[r]easonable suspicion supported Solomon's initial investigative detention. Solomon's subsequent arrest was supported by probable cause that he possessed crack cocaine. This probable cause was a product of the observation of crack cocaine in Solomon's hand. Finally, Solomon was fully and clearly advised of his *Miranda* rights before he knowingly and voluntarily made his statement." United States Response to Defendant's Motion to Suppress Evidence, p. 1. Additionally, at the hearing, the Government objected to the defense raising a new argument in support of the defendant's motions to suppress, namely that the conduct of Officer Reddy and Kavals constituted an illegal search.

A hearing on the defendant's motion to suppress and amended motion to suppress was held before this Court on July 31, 2008.

I. Facts.

At the July 31, 2008 suppression hearing, Police Officer Michael Reddy ("Officer Reddy") testified. Officer Reddy is in his ninth (9th) year as a police officer. Officer Reddy testified that approximately two or three days prior to May 3, 2007, he and his partner, Officer Kavals, met face-to-face with a confidential informant ("CI") personally known to them to have given true and accurate information in the past. The subsequent police report written by Officer Reddy stated that the CI had told them that twice in the Homewood area of Pittsburgh he had observed a young black male in his 20s selling drugs with a gun in his possession. The CI described the car driven by this alleged drug dealer to be a black Intrepid with Pennsylvania license plate number GCZ1271. The CI did not know the identity of the person driving the Intrepid and selling drugs. The CI also did not provide the police officers with any information

about the individual's height or weight.

Thereafter, having received this information from the CI, on May 3, 2007, Officers Reddy and Kavals were in an unmarked police car in the Homewood area of Pittsburgh. Officer Reddy was driving. The area where the officers were located is a high crime area in that a high volume of drug activity takes place there. The officers were on a general patrol when they observed a black Intrepid parked on the side of the street on Brushton Avenue. The Pennsylvania license plate number of the Intrepid was FCZ1271. They drove around the block and approached the vehicle from behind. As they approached, they saw a black male exiting the Intrepid. They did not recognize the individual. Officer Reddy observed the male looking intently at his hand. The police officers could not see what the individual had in his hand, but based upon the individual's conduct Officer Reddy suspected it was drugs. The Intrepid then began to drive down Brushton Avenue.

The police officers did not stop to question this unknown person exiting the Intrepid. Instead they began to follow the Intrepid down the street, intending to do a traffic stop. Before they could execute the traffic stop, however, the Intrepid pulled over. Located across the street from where the Intrepid parked was a store. The driver of the Intrepid, the defendant, Charles Thomas Solomon ("Solomon"), exited the vehicle.

The police officers quickly pulled their vehicle up behind the Intrepid and got out of their car. The police officers' badges were displayed on lanyards hung over their necks. They quickly approached Solomon. As they approached Solomon Officer Reddy said to Solomon "Stop. Hold up. What do you have in your hand?" Solomon neither stopped nor answered Officer Reddy. Officer Reddy may have asked Solomon a second time what did he have in his hand. If Officer

Reddy did ask Solomon a second time what was in his hand, Solomon again did not answer Officer Reddy's question. Instead, Solomon placed his right hand in the open rear window of the Intrepid. Officer Kavals grabbed Solomon's right arm and pulled Solomon's arm away from the window. Although Solomon's right hand was closed, Officer Reddy could see a baggie in Solomon's hand. Officer Reddy could not see what were the contents of the baggie.

While Officer Kavals still held onto Solomon's arm, Officer Reddy again asked Solomon "What do you have in your hand?". Solomon then opened his hand and revealed a baggie that contained what Officer Reddy believed, having seen crack cocaine many times before, was crack cocaine. Ultimately the contents of the baggie were tested and found to contain 1.1 gram of crack cocaine.

The police officers then placed Solomon under arrest and searched his person. As they did so, Solomon told them that he had a gun on him. A search of Solomon's person revealed a nine (9) millimeter handgun. At no time did the police officers have a search warrant to search either Solomon or his vehicle.

In the back seat of Solomon's Intrepid were 2 puppies. Prior to taking Solomon to be questioned, the police officers made arrangements to have the puppies taken to the home of Solomon's mother, who, Solomon explained to the officers, is disabled.

Officer Reddy is approximately six (6) feet three (3) inches tall and weighs approximately 230 to 240 pounds. Officer Kavals is approximately six (6) feet six (6) inches tall and weighs approximately 300 pounds. Solomon is approximately five (5) feet eight (8) inches tall and weighs approximately 150 pounds.

Upon arresting Solomon, the police officers took him to the Dormont section of Pittsburgh to be questioned. The drive took approximately 20 minutes. The officers did not question Solomon about the incident in the police car. They did tell Solomon to think about what he wanted to do.

Upon arrival in Dormont, Solomon was placed in an interview room and given his Miranda rights in written form. Solomon waived his rights and agreed to be interviewed.

The tone of the interview was calm. There were no confrontations. During the interview process, Solomon was told by Officer Reddy of different options available to him. Officer Reddy did not promise Solomon, on or off of the record, that he would be given leniency if he made a statement. Officer Reddy did tell Solomon that leniency was a possibility if he cooperated. Officer Reddy did not tell Solomon that if he made a statement, some of the charges against him would be dropped. Officer Reddy may have told Solomon that the case could be adopted by the federal government for prosecution.

At one point during the interview process, the officers left the interview room so that Solomon could write out a statement. When they returned to the room, they read the statement. Officer Reddy then told Solomon that what Solomon had written did not appear to be truthful based upon what the officers had personally observed Solomon doing in the Intrepid. The officers told Solomon that if he was not 100 percent (100%) truthful, then they could not trust Solomon or any information he would give them. Solomon indicated that he understood what he was being told.

Solomon then wrote the rest of his statement, changing part of the statement he had already written out. Solomon noted on the Voluntary Statement that "[a]ll the scratch out areas

5

are on my behalf)."

In total, Solomon spent about three (3) hours in the interview room. During that time period, Officers Reddy and Kavals interviewed Solomon two different times. Each time the officers interviewed Solomon, they did so for approximately thirty (30) to forty-five (45) minutes.

After writing the statement, Solomon was given a low bond and released.

Initially Solomon's case proceeded at the state court level. Officer Reddy was present at Solomon's preliminary hearing in state court. At this hearing, the charge of possession with intent to deliver was dropped.

Thereafter, six (6) months passed. Prosecution of Solomon was then adopted by the United States, including a charge of possession with intent to deliver crack cocaine.

II. Legal Analysis.

The first issue that this Court must decide is whether the police officer's conduct with respect to the defendant when they confronted him on May 3, 2007 was lawful or violative of the Fourth Amendment to the United States Constitution. The defense argues that the police officers' conduct with respect to the defendant violated the Fourth Amendment because: (1) they lacked probable cause to believe he was engaged in criminal activity; and (2) the officers' action of getting Solomon to open his hand and reveal the baggie of drugs while Officer Kavals held onto Solomon's arm, constituted an illegal search. To the contrary, the Government argues that the police officers' conduct with respect to the defendant, including the officers asking Solomon what was in his closed hand while Officer Kavals' held onto Solomon's arm, constituted a lawful *Terry* stop.

The Fourth Amendment is not a guarantee against all search and seizures, but rather, only against unreasonable ones. As explained by the Third Circuit Court in U.S. v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000), cert. den'd, 532 U.S. 1014, 121 S.Ct. 1748 (2001):

> [u]nder *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and subsequent cases, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Elaborating on this point, the Supreme Court has said, "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that is required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." The question we must address is whether [the police officers] had the "minimal level of objective justification" necessary for a *Terry* stop. And in evaluating reasonable suspicion, "we must consider the totality of the circumstances – the whole picture'."

Id. at 353 (citations omitted). "Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence,' and only a 'minimal level of objective justification' is necessary for a Terry stop." U.S. v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006) (internal quotations and citation omitted).

Moreover, when the investigatory stop by the police officers is based, in part, on a tip from another individual, "'the question is whether the tip should be deemed sufficiently trustworthy in light of the total circumstances'." Valentine, 232 F.3d at 355. "The reliability of a tip, of course, is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances." Id.

7

Furthermore, "it is well established that officers are allowed to ask questions of anyone . . . without having any evidence creating suspicion." Id. at 356, citing Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) ("Since Terry we have held repeatedly that mere police questioning does not constitute a seizure.").

Finally, when police officers make an investigative stop, they may take such steps as are "reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop." U.S. v. Hensley, 469 U.S. 221, 235 105 S.Ct. 675 (1985). Police may not, however, exceed the least-intrusive means of detention and/or investigation, or a *Terry* stop can ripen into an arrest. See U.S. v. Sharpe, 470 U.S. 675, 685-86, 105 S.Ct. 1568 (1985). To make the determination of whether a stop is a proper *Terry* stop or an improper *de facto* arrest, courts must consider the following: (1) the duration of the stop; (2) the law enforcement purpose(s) justifying the stop; (3) whether the police officers diligently sought to carry out those purposes given the circumstances; and (4) alternative means by which the police could have served their purposes. Id. at 684-87.

Applying the above-stated law to the facts of this case, established through the uncontradicted testimony of Officer Reddy, clearly the officers had a reasonable, articulable suspicion to believe that Solomon was engaged in criminal activity. The officers had been told by a reliable CI that a black male in his 20's, driving a black Intrepid with Pennsylvania license plate number GCZ1271, was selling drugs in the Homewood section of Pittsburgh with a gun. On May 3, 2007, when Officers Reddy and Kavals first spotted Solomon in the Homewood section of Pittsburgh, he was a black male in his 20's sitting a black Intrepid with Pennsylvania license plate number FZ1271 while a second individual got out of the vehicle, looking intently at

8

something in his hand, an action which the police officers had seen before when observing drug activity. Morever, when with their police badges displayed, the officers asked Solomon to stop and tell them what was in his hand, he disobeyed their request and instead, put his closed hand in his open car window. Based upon the combination of all of this conduct, the police officers clearly had "a reasonable, articulable suspicion that criminal activity [wa]s afoot." Terry, *infra*.

Moreover, the conduct of the officers, specifically Officer Kavals' grabbing Solomon's arm when Solomon put it in the open window of his vehicle and the officers then asking Solomon what he had in his closed hand, to which Solomon replied by opening his hand to reveal a baggie with crack cocaine in it, was "reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop" and did not turn the events into an improper *de facto* arrest or an illegal search as argued by the defense. The officers had told Solomon, whom they had reasonable suspicion to believe was selling drugs with a handgun, to stop. Solomon did not obey this command and looked to be attempting to dispose of whatever he had in his closed hand. The officers had every right to ensure that Solomon was not successful in his attempt. Accordingly, the police officers's conduct with respect to Defendant Solomon was lawful and did not violate the defendant's rights under the Fourth Amendment to the United States Constitution.

The next issue we need to determine is whether the officers had probable cause to arrest Solomon. The appellate court explained in U.S. v. Stubbs, 281 F.3d 109 (3d Cir.), cert. den'd, 535 U.S. 1028, 122 S.Ct. 1630 (2002), that:

> [p]olice have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it. Probable cause is determined by the totality of the circumstances. We must assess the knowledge and information which the officers

9

possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest in determining if probable cause existed. "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.

Id. at 122 (internal quotations and citations omitted).

Here, the uncontradicted evidence is that upon Officer Kavals lawfully grabbing the Defendant's arm, and pulling it out of the window of the vehicle, Officer Reddy observed a bag in Solomon's hand that based upon Officer Reddy's experience as a police officer of 9 years, he suspected contained drugs. Officer Reddy then asked Solomon what was in his hand. In reply, Solomon opened his hand to reveal a baggie which, based upon Officer Reddy's experience as a police officer of 9 years, he suspected was crack cocaine. We find that at this point, the police officers had probable cause to arrest Solomon.

The next issue raised by the defendant's motion to suppress is whether Solomon's statement to the police following his arrest should be suppressed because the defendant was questioned without being warned of his Miranda rights and thereafter, made an incriminating statement.

Solomon's written statement was made after he had been arrested. Therefore, Miranda warnings had to have preceded when he made his written statement or said statement must be suppressed. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966). While Solomon argues that he made the statement without being advised of his Miranda rights, we find, after hearing the uncontradicted evidence from Officer Reddy, and reviewing Exhibit 1 from the suppression hearing, the Voluntary Statement form signed by Solomon on May 3, 2007, that prior to being interviewed and making a written statement, Solomon was advised in writing of his Miranda

rights, and that he waived each of those rights in writing.

Finally, Defendant argues that under the totality of the circumstances, his statement was involuntarily made and therefore, must be suppressed: "defendant was threatened with a high bond, federal prosecution, and increased incarceration should he refuse to make a statement, and otherwise subjected to psychological coercion." Amended Motion to Suppress, ¶ 6.

As explained by the appellate court in Lam v. Kelchner, 304 F.3d 256 (3d Cir. 2002):

> [t]he Due Process clauses of the Fifth and Fourteenth Amendment bar the use of incriminating statements that are involuntary. *See generally* LaFave et al. 2 *Criminal Procedure* § 6.2(b), p. 444 (2d ed. West 1999). The voluntariness standard is intended to ensure the reliability of incriminating statements and to deter improper police conduct, *id.* at pp. 444-45. The ultimate issue of voluntariness is a legal question requiring an independent federal determination, *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Thus, under the AEDPA habeas standard, we are required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent.
>
> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion."*Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States,* 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted).

Id. at 264 (footnote omitted).

Contrary to the defense's position, after consideration of the testimony of Officer Reddy at the July 31, 2008 suppression hearing, and the contents of Government's Exhibit 1, the Voluntary Statement form signed by the defendant on May 3, 2008, we find that under the totality of the circumstances, the defendant's custodial statement was voluntarily and knowingly made. Officer Reddy testified that he and Officer Kavals explained to Solomon what his options were, and that they were willing to make recommendations favorable to Solomon with respect to his case, but only if they believed, based upon what they knew about Solomon's conduct, that Solomon was being truthful to the police officers. This conduct by the police officers does not make Solomon's statement involuntary. Therefore, the defendant's written statement will not be suppressed.

An appropriate Order will follow.

August 29, 2008

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior District Court Judge